IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| SHARON LEWIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:11cv222-MHT |
| | ) | (WO) |
| FEDERAL DEPOSIT INSURANCE | ) | |
| CORPORATION, as Receiver | ) | |
| for Colonial Bank, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

OPINION

Plaintiff Sharon Lewis filed this slip-and-fall lawsuit against defendant Federal Deposit Insurance Corporation (FDIC), as receiver for Colonial Bank, Inc. Lewis has invoked the jurisdiction of this federal trial court pursuant to 12 U.S.C. § 1821(d)(6)(A)(ii), a statutory provision that authorizes federal district court to hear certain claims against the FDIC. Now pending is the FDIC's motion for summary judgment. For the following reasons, that motion will be granted.

## I.   SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## II. BACKGROUND

Colonial Bank owned a recently constructed, two-story house located in Atlanta, Geogia.  Harry Norman Realtors was hired to place it on the market, and real-estate agent Rodney Hinote scheduled an open house for December 14, 2008.  At approximately 1:40 p.m. on December 14, Hinote unlocked the property, turned on the lights, and conducted a brief walkthrough.  He did the same for other properties he was showing that day in the neighborhood.

Lewis attended the open house with her husband, her son, her son's fiancée, and the fiancée's young daughter. She remembers seeing a puddle by the sidewalk and noticing that the grass was damp, apparently indicating that it had rained earlier in the day. The Lewis family entered the house and looked around the upper floor for nearly ten minutes before heading downstairs. Lewis's son descended first and without incident. Lewis followed, holding on to the hand rail and "taking [her] time walking down." Dep. Sharon Lewis 20:15-21 (Doc. No. 15-3). Despite being careful, she lost her balance and fell down the stairs.

After the fall, Lewis's son and his fiancée inspected the stairs and noticed an unspecified amount of water on the steps.[1] The son reports that the water had "dried up edges" approximately five-to-six inches wide. Aff.

---

1. Lewis testified that her family members informed her that the liquid she allegedly slipped on was water. The court will therefore assume, for purposes of resolving the summary-judgment motion, that the liquid in question was water.

3

Archie Lewis Jr. ¶ 8 (Doc. No. 23).  Neither Lewis nor
her husband recall seeing water on the stairs.

Lewis testified that her son took pictures after the
accident, but that she had never looked at them and "[did
not] know what they show."  Dep. Sharon Lewis 41:1-20.
(Doc. No. 15-3).  She states that these pictures had been
given to her initial attorney when she filed an earlier
suit in Georgia, but, as of her April 26, 2012,
deposition, they had not been given to her current
counsel.

When Lewis fell, Hinote was at a neighboring
property.  He saw the ambulance arrive and went over to
the house, spoke with the Lewis family, and gave them his
contact information.  No one told Hinote about the
potential hazard on the stairs, and he did not observe
anything out of the ordinary.

At his deposition, Hinote recalled walking the stairs
twice without noticing any water and testified to being
"100 % certain" that there was no water on the stairs

4

when he inspected the home prior to the open house.[2]  Dep. Rodney Hinote 28:5-20 (Doc. No. 15-4).   Moreover, Hinote's uncontroverted testimony revealed that the house had been "winterized," which means that the water had been shut off and the pipes drained.

### III. DISCUSSION

Lewis asserts that Hinote negligently failed to remove the water on which she slipped and fell; that Colonial Bank is responsible for Hinote's failure; and

---

2.  There is disagreement as to how long after Hinote's inspection the fall occurred.  Hinote says that he unlocked and inspected the house just before 2:00 p.m. and saw the ambulance arrive approximately 20-to-30 minutes later.  Dep. Rodney Hinote 26:21-27:4 (Doc. No. 15-4).  However, Lewis states that she arrived at the house between 1:00 and 1:30.  Dep. Sharon Lewis 23:17-21 (Doc. No. 15-3).  Lewis's son provides a third opinion: He remembers viewing two other houses for "a minimum of 45 minutes" before entering the house in question.  Aff. Archie Lewis Jr. ¶ 5 (Doc. No. 23).  If those properties were also part of Hinote's open house, then the Lewis family would not have entered the house until approximately 2:45 p.m.  The fall would have therefore occurred approximately 60 minutes after Hinote's inspection.  Taking the facts in the light most favorable to Lewis, the court will presume that the fall happened one hour after Hinote completed his walkthrough.

that, because the FDIC is now the receiver for Colonial
Bank, it is properly the defendant.  The evidence is
insufficient to support the conclusion that Hinote was
negligent.


### A. Georgia Law Applies

Lewis and the FDIC agree that state law governs this
case and that, because Lewis's fall occurred in Atlanta,
Georgia, Georgia substantive law governs in particular.
See Williams v. Nw. Fin. Ala., Inc., 723 So.2d 97, 100
(Ala. Civ. App. 1998) ("Alabama adheres to the
traditional rule of lex loci delicti, which provides that
an Alabama court will determine the substantive rights of
an injured party according to the law of the state where
the injury occurred.").


### B. The FDIC Is Not Liable

The only inference that a reasonable factfinder
could draw from the evidence presented is that the water

6

Lewis slipped on did not come from a leak in the house itself.  The house had been recently constructed and was in excellent condition at the time of the fall.  It was not and had never been occupied.  Moreover, Harry Norman Realtors had "winterized" the house, which meant, as stated, that the water had been shut off and all residual water had been drained from its pipes to guard against freezing.  Thus, there was no water in the house, that could have leaked onto the steps, prior to Hinote unlocking the door in advance of the open house.

Lewis testified that the grass outside the house was damp, which indicated that it might have rained earlier that day.  However, it would be unreasonable to conclude that rainwater leaked through the roof and into the house.  First, the rainwater would have had to go through the roof, the ceiling, and quite possibly the floor above to reach the step where Lewis fell.  Such a dramatic leak would not go unnoticed in an otherwise brand new home. Second, had water actually leaked onto the stairs, it

would have left behind evidence of its path through the roof and floor in the form of water spots and warping. Even with time to inspect the property, both immediately after the accident and during discovery, there is absolutely no evidence of that kind of damage and the pictures that Lewis's son supposedly took have yet to materialize. It would therefore be unreasonable for a factfinder to conclude that water leaked through the roof and onto the stairs.[3] The water, assuming its existence, must therefore have come into the house from some outside

---

3. Lewis spends the majority of her brief discussing the "dried up edges" of the water her son saw on the step. Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. at 2-3 (Doc. No. 23). Lewis argues that the dried edges prove that the water must have been on the stair when Hinote conducted his initial walkthrough. However, to support her inference, Lewis offers no evidence whatsoever about how water would dry in the particular circumstances of this case. Thus, the dried edges do not prove that the water was there an unreasonably long time. Moreover, that the water was of recent origin is reflected by the undisputed facts that, during his walkthrough, Hinote walked up and down the stairs without noticing the water and that Lewis and her son testified that they did not notice any water on the stairs before the accident.

source after Hinote unlocked the doors and conducted his walkthrough in advance of the open house.

In Georgia, "a proprietor has a statutory duty to exercise ordinary care to keep its premises safe, which includes inspecting the premises to discover possible dangerous conditions of which the [proprietor] does not have actual knowledge, and taking reasonable precautions to protect invitees from dangers foreseeable from the arrangement or use of the premises." Benefield v. Tominich, 708 S.E.2d 563, 566 (Ga. Ct. App. 2011) (internal quotation marks omitted). In this particular case, where the water must have come into the house after the initial inspection, a breach of duty occurs only when the property is not inspected with sufficient frequency. Patrick v. Macon Hous. Auth., 552 S.E.2d 455, 459-60 (Ga. Ct. App. 2001).

Inspection frequency must be proportionate to the hazards typically associated with the property's use. Id. In Patrick the plaintiff fell in an apartment-

complex laundry room that the owner inspected for hazards once every two hours.  Id. at 456, 459.  The court found that the circumstances of the case were "different from those in supermarkets or fast food restaurants where the nature of the business creates conditions which cause slip and falls to occur with some frequency."  Id. at 460.  The owner therefore had "no duty to ... constantly inspect the floors in the absence of unusually dangerous conditions."  Id.  An inspection every two hours, the court concluded, easily satisfied the owner's burden and entitled it to summary judgment.  Id.

If the housing authority inspected with adequate frequency in Patrick, then Hinote clearly met his duty to inspect the home with reasonable frequency in the current case.  Water hazards are far more common in a laundry room than in the stairwell of an unoccupied, winterized house.  As a result, Hinote was not obligated to perform more frequent inspections than those approved of in Patrick.  Even the most generous reading of the evidence

10

in this case indicates that Lewis fell no more than an hour after Hinote's initial inspection, well within the two hours the Patrick court found reasonable.  The court therefore concludes that the frequency of inspection in this case easily satisfies the demands of reasonable care.

That it may have rained earlier in the day does not require a different result.  There is no evidence that it was actually raining during the open house and, even if it had been, Hinote was not obligated to "mop up the rain as fast as it . . . [wa]s carried in by wet feet." Walker v. Sears Roebuck & Co., 629 S.E.2d 561, 564 (Ga. Ct. App. 2006).  "The risk of harm imposed by some accumulation of water on the floor ... during rainy days is not unusual or unreasonable in itself, but is one to which all who go out on a rainy day may be exposed and which all may expect or anticipate."  Id.

***

11

Lewis has offered no evidence tending to show that Hinote breached his duty to exercise reasonable care in preparing and maintaining the property during the open house.   The FDIC is therefore entitled to summary judgment on Lewis's slip-and-fall claim.

An appropriate judgment will be entered.

DONE, this the 27th day of August, 2012.

                    /s/ Myron H. Thompson
                UNITED STATES DISTRICT JUDGE